## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **INTERNATIONAL RIGHTS ADVOCATES**, | |
| *Plaintiff,* | |
| **v.** | Case No. 1:24-cv-894-RCL |
| **MARS, INC.**, *et al.*, | |
| *Defendants.* | |

## MEMORANDUM OPINION

Plaintiff International Rights Advocates ("IRAdvocates"), pursuant to the private attorney general provisions of the D.C. Consumer Protection Procedures Act ("DCCPPA"), filed a complaint in D.C. Superior Court against a trio of major chocolate manufacturers, alleging that their representations about their ethical cocoa sourcing practices are false and misleading.

The defendants removed the case to this Court. IRAdvocates now moves to remand the case to D.C. Superior Court, arguing that removal was improper because this Court lacks subject-matter jurisdiction. There is no disagreement that there is complete diversity of citizenship, as is required for the exercise of diversity jurisdiction, but the parties dispute whether the defendants have met their burden to show an amount in controversy exceeding $75,000. IRAdvocates also requests reimbursement of attorneys' fees and costs associated with the remand litigation.

For the reasons contained herein, the Court will **GRANT** IRAdvocates' Motion for Remand, but **DENY** its Motion for Attorneys' Fees and Costs.

## I.    BACKGROUND

IRAdvocates is a § 501(c)(3) non-profit public interest organization involved in advocacy, education, and impact litigation. *See* Am. Compl. ¶¶ 103–105, Notice of Removal ex. 1, ECF No.

1-2.  IRAdvocates is incorporated under the laws of D.C.  *See* Civil Cover Sheet 1, Notice of Removal attach. 1, ECF No. 1-1.  The defendants are large multinational food companies engaged, among other things, in the global cocoa and chocolate trade.  Am. Compl. ¶¶ 106, 109, 112.  There is no disagreement that each defendant is diverse in citizenship to IRAdvocates based on their respective headquarters and places of incorporation.[1]

According to IRAdvocates, each defendant publicly represents to consumers that it has implemented policies to reduce or eliminate the use of forced and child labor in its supply chain.  Am. Compl. ¶ 34.  For example, Mars claims that it undertakes "comprehensive human rights due diligence processes," that it "unequivocally condemns the use of child labor," and that it maintains internal initiatives such as its "Protecting Children Action Plan" and "Child Labor Monitoring and Remediation Systems" designed to ensure ethical sourcing of cocoa.  *Id.* ¶¶ 46–47, 53.  Cargill claims to have put in place a "Human Rights Policy" encompassing issues such as forced and child labor, and that it has undertaken programs to "break[] the cycle of child labor in cocoa production."  *Id.* ¶¶ 59, 61.  And Mondelez claims to "explicitly prohibit[] child [labor] in [its] operations," and represents that the company has "zero tolerance for modern slavery . . . ."  *Id.* ¶¶ 71, 80.

IRAdvocates further alleges that, notwithstanding their representations to the contrary, all three defendants in fact source cocoa from plantations that utilize child labor and other unjust labor practices.  IRAdvocates claims to have undertaken an investigation, in collaboration with CBS News and with the cooperation of a whistleblower, in which it visited Ghanaian plantations from

---

[1] Defendant Mars, Inc. is headquartered in Virginia and incorporated in Delaware.  Notice of Removal ¶ 12, ECF No. 1.  Defendant Mars Wrigley Confectionery US, LLC is headquartered in New Jersey, has subsidiaries headquartered in Illinois and Virginia, and is incorporated in Delaware.  *Id.* ¶ 13; Am. Compl. ¶ 107.  Defendant Cargill, Inc. is headquartered in Minnesota and incorporated in Delaware.  Notice of Removal ¶ 14.  Defendant Cargill Cocoa and Chocolate, Inc. is likewise headquartered in Minnesota and incorporated in Delaware.  *Id.* at ¶ 15.  Defendant Mondelez International, Inc. is headquartered in Illinois and incorporated in Virginia.  *Id.* ¶ 16.  No defendant is a domiciliary of the District of Columbia.

which the defendants purchase their cocoa.  *Id.* ¶ 83.  IRAdvocates alleges that the majority of the workforce consisted of children working under unsafe conditions, and that a buyer for the defendants used "rigged scale[s]" in order to deliberately underpay their laborers.  *Id.* ¶¶ 83–86. Furthermore, IRAdvocates claims to have looked into some of the names of children who had supposedly benefited from the defendants' child labor intervention programs, and found that some of the named children had not received the benefits that the defendants purported to have given them, whereas other listed names did not refer to real people and appear to have been fabricated entirely.  *Id.* ¶¶ 90–91.  IRAdvocates also cites investigative reports by other non-governmental and media organizations that, it claims, corroborates its own account.  *Id.* ¶¶ 94–98.

IRAdvocates argues that consumers value ethical labor practices, and that the defendants' representations would lead a reasonable consumer to believe that the defendants have implemented stronger guarantees against child and forced labor than they actually have.  *Id.* ¶¶ 100–02.

In November 2023, IRAdvocates initiated a lawsuit against the defendants in D.C. Superior Court.  *See* D.C. Superior Court Docket Report 5, Notice of Removal ex. 2, ECF No. 1-3. IRAdvocates filed the operative Amended Complaint in February 2024.  *See* Am. Compl. at 1. The Amended Complaint lists a single cause of action: misrepresentation in violation of the D.C. Consumer Protection Procedures Act, D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), & (h). Importantly, IRAdvocates invokes the private attorney general or representative-action provision found at D.C. Code § 28-3905(k)(1), which authorizes a public interest organization to bring an action challenging an unlawful trade practice on its own behalf and on behalf of the "general public"—that is, the residents of the District of Columbia.  IRAdvocates seeks declaratory relief, an injunction requiring the defendants to remediate their allegedly misleading public statements,

3

and attorneys' fees and costs as provided by statute. Prayer for Relief, Compl. at 30; *see also* D.C. Code § 28-3905(k)(2)(C).

In March 2024, the defendants removed the case to this Court. *See* Notice of Removal, ECF No. 1. The defendants believed that removal was permissible because this Court could properly exercise jurisdiction over the dispute pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332(a). In April 2024, IRAdvocates filed a Motion to remand the case back to D.C. Superior Court. *See* Mot. for Remand, ECF No. 17. At the same time, IRAdvocates filed a Motion for Attorney Fees and Costs associated with the incipient remand dispute, arguing that the defendants had no reasonable basis upon which to remove the case to federal court. *See* Mot. for Attorney Fees and Costs, ECF No. 18. The defendants responded to both motions in May 2024. *See* Resp. to Mot. for Remand, ECF No. 23; Resp. to Mot. for Attorney Fees, ECF No. 22. IRAdvocates submitted its reply briefs the following week. *See* Reply for Remand, ECF No. 24; Reply for Attorney Fees, ECF No. 25. Both Motions are now ripe for the Court's review.

## II.    LEGAL STANDARDS

A defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" to federal court, "[e]xcept as otherwise expressly provided by Act of Congress . . . ." 28 U.S.C. § 1441. Accordingly, removal is proper only if the federal court would possess original subject-matter jurisdiction over the action, pursuant either to Congress's grant of so-called diversity jurisdiction in 28 U.S.C. § 1332(a), or its conferral of "federal question" jurisdiction in 28 U.S.C. § 1331. *See Apton v. Volkswagen Grp. of Am., Inc.*, 233 F. Supp. 3d 4, 10 (D.D.C. 2017) (Brown Jackson, J.). A federal court may exercise diversity jurisdiction if (1) there is complete diversity of citizenship (i.e., no plaintiff is a citizen of the same state as any defendant) and (2) the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). Neither party contends that this case comes within the Court's federal question jurisdiction.

"[T]he party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). In removal disputes such as this, that burden falls to the defendants, who must plausibly show that it is more likely than not that the amount in controversy will exceed the statutory $75,000 jurisdictional threshold. If the amount in controversy is contested, as it is here, the defendant must provide some evidence that it will surpass the jurisdictional floor; "a defendant may not rely on sheer speculation to satisfy its burden of showing the amount in controversy." *Inst. for Truth in Mktg. v. Total Health Network Corp.*, 321 F. Supp. 3d 76, 83–84, 89 (D.D.C. 2018) (Brown Jackson, J.) (first quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87–89 (2014), and then citing *Wexler v. United Air Lines, Inc.*, 496 F. Supp. 2d 150, 154 (D.D.C. 2007)).

## III. THE DEFENDANTS HAVE NOT SATISFIED THE AMOUNT-IN-CONTROVERSY REQUIREMENT, SO REMAND IS APPROPRIATE

The defendants argue that the statutory amount in controversy requirement is met for two reasons. First, changing their product labeling, public messaging, or both to comply with the plaintiff's requested injunctive relief would cost more than $75,000. Second, the plaintiff's requested attorneys' fees, which are provided by statute and therefore may be counted toward the amount in controversy, will likely exceed $75,000. *See Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 144 (D.D.C. 2014).

The viability of the defendants' arguments hinges on the application of the so-called non-aggregation principle, articulated in *Snyder v. Harris*, 394 U.S. 332 (1969). In that case, the Supreme Court held that "the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy" the amount in controversy required for diversity jurisdiction. *Id.* at 335. The question is whether, in a DCCPPA representative action brought on behalf of the general public, the amount in controversy should be measured by the total combined costs to the defendants

of complying with the plaintiff's requested relief, or by a *pro rata* division of that cost among the entire population of D.C., whom the plaintiff purports to represent.[2]  The defendants offer four arguments why their hypothetical costs should not be disaggregated, most of which are contrary to the overwhelming weight of this District's precedent, and none of which is ultimately availing.

### A. The Non-Aggregation Principle Applies in Single-Plaintiff Cases

The defendants argue first that in single-plaintiff disputes such as this one the non-aggregation principle does not apply.  In support, the defendants cite two Supreme Court opinions, each of which discusses the non-aggregation principle, and each of which states that it applies in cases with two or more plaintiffs.  *Troy Bank of Troy, Ind. v. G. A. Whitehead & Co.*, 222 U.S. 39, 40 (1911) ("When two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount . . . ."); *Snyder*, 394 U.S. at 335 ("[T]he separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement.").  Though the defendants acknowledge that IRAdvocates brings this suit on behalf of all D.C. consumers, as provided by statute, the defendants urge that this feature of D.C. law cannot justify non-aggregation for two reasons.  First, the plaintiff seeks a unitary remedy—namely, a singular injunction binding all the defendants—that cannot be divided among the population whom the plaintiff claims to represent.  Resp. to Mot. for Remand at 20–21.  Second, applying non-aggregation in a single-plaintiff representative action such as this one enables plaintiffs to avoid

---

[2] Some courts have considered using only a subset of the D.C. population as the denominator, if the group of persons allegedly harmed by the defendants' misrepresentation is reasonably identifiable and estimable.  *See, e.g.*, *Breathe DC v. Santa Fe Nat. Tobacco Co.*, 232 F. Supp. 3d 163, 171–72 & n.9 (D.D.C. 2017) (approximating how many D.C. residents use the defendants' products and then further reducing that number in proportion to the estimated share of those customers who are likely to be actually misled by the defendants' representations).  The Court need not dwell on that alternative approach because, in any event, the defendants have made no effort to estimate the number of D.C. residents who have in fact viewed their allegedly misleading statements.

crossing the jurisdictional amount-in-controversy threshold simply by declaring that their claim is brought on behalf of the general public. That, in the defendants' view, "elevate[s] form over substance" by conditioning the court's jurisdiction on a plaintiff's arbitrary and semantic pleading decisions rather than the tangible facts of the dispute. Resp. to Mot. for Remand at 19 (quoting *In re Folgers Coffee, Mktg. Litig.*, No. 21-2984-MD-W-BP, 2021 WL 5106457, at *4 (W.D. Mo. Aug. 19, 2021) (interpreting the DCCPPA's private attorney general provision, but applying Eighth Circuit precedent for the amount-in-controversy determination).

These arguments have been rejected, both implicitly and explicitly, by courts in this District. First, no court in this District has accepted the defendants' suggestion that *Troy Bank of Troy* or *Snyder* compels aggregation of the defendants' costs in single-plaintiff representative suits. Indeed, *Troy Bank of Troy* does not discuss single-plaintiff disputes at all. *Snyder* does, but calls for aggregation "in cases in which a single plaintiff seeks to aggregate two or more *of his own claims* against a single defendant." *Snyder*, 394 U.S. at 335 (emphasis added).[3] This language from *Snyder* is inapposite to the genre of representative actions, in which a single plaintiff seeks to aggregate the claims of *itself and others*.[4] *See Nat'l Consumers League v. Bimbo Bakeries USA*, 46 F. Supp. 3d 64, 72 (D.D.C. 2014) (Lamberth, J.) (quoting *Snyder*, 394 U.S. at 335).

---

[3] The only D.C. Circuit case cited by the defendants contains language that is virtually identical to *Snyder*. *See Rosenboro v. Kim*, 994 F.2d 13, 18 (D.C. Cir. 1993) (stating that "the claims of multiple plaintiffs may not be aggregated" to satisfy the amount-of-controversy requirement for diversity jurisdiction). Like *Snyder*, then, it provides no controlling law for single-plaintiff representative actions.

[4] In fact, *Snyder*'s language on non-aggregation in single-plaintiff cases is doubly inapposite to this case because it refers only to *single-defendant* cases, whereas this case involves multiple defendants. Nevertheless, it bears mention that courts in this District have uniformly declined to aggregate the defendants' costs in DCCPPA representative actions, even in single-defendant cases. *See, e.g.*, *Breathe DC v. JUUL Labs, Inc.*, No. 20-cv-619-JEB, 2023 WL 4531767, at *4–5 (D.D.C. July 13, 2023) (Boasberg, C.J.); *Rasay v. Pepperidge Farm, Inc.*, No. 22-cv-449-BAH, 2022 WL 4300061, at *6–7 (D.D.C. Sept. 19, 2022) (Howell, C.J.); *Inst. for Truth in Mktg.*, 321 F. Supp. 3d at 91–92 (Brown Jackson, J.); *Clean Label Project Found. v. NOW Health Grp., Inc.*, No. 21-cv-11-JDB, 2021 WL 2809106, at *4–6 (D.D.C. July 6, 2021) (Bates, J.); *Animal Legal Def. Fund v. Hormel Foods Corp.*, 249 F. Supp. 3d 53, 59–62 (D.D.C. 2017) (Kollar-Kotelly, J.); *Beyond Pesticides v. Exxon Mobil Corp.*, No. 20-cv-1815-TJK, 2021 WL 1092167, at *2 (D.D.C. Mar. 22, 2021) (Kelly, J.).

*Troy Bank of Troy* and *Snyder* are more instructive if a representative DCCPPA action is instead treated as a *de facto* multi-plaintiff dispute for jurisdictional purposes. In multi-plaintiff cases, aggregation is appropriate where "several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest . . . ." *Troy Bank of Troy*, 222 U.S. at 40–41; *see also Snyder*, 394 U.S. at 335 (same). But the case law in this District is clear and uniform that the relief available in a typical DCCPPA representative action does not constitute a "common and undivided" interest because each member of the public could hypothetically sue as an individual to enforce his or her discrete right to such relief. *See Clean Label Project Found. v. NOW Health Grp., Inc.*, No. 21-cv-11-JDB, 2021 WL 2809106, at *4 (D.D.C. July 6, 2021) (quoting *Animal Legal Def. Fund v. Hormel Foods Corp.*, 249 F. Supp. 3d 53, 61–62 (D.D.C. 2017)); *Earth Island Inst. v. BlueTriton Brands*, 583 F. Supp. 3d 105, 111 (D.D.C. 2022) (quoting *Toxin Free USA v. J.M. Smucker Co.*, 507 F. Supp. 3d 40, 46 (D.D.C. 2020)).[5] In other words, IRAdvocates is suing to vindicate the divisible interests of each individual D.C. consumer; the fact that a single injunction might redress each consumer's injury simultaneously is beside the point.[6]

---

[5] On the other hand, two fact patterns that exemplify a common and undivided interest include actions for the disgorgement of profits, which seek to create a fixed fund "in which the members of the general public" would share an indivisible interest, *Toxin Free USA*, 507 F. Supp. 3d at 46, or a multi-plaintiff suit seeking enforcement of a single vendor's lien which neither plaintiff could "enforce in the absence of the other," as was the case in *Troy Bank of Troy*. 222 U.S. at 41; *see also Santa Fe Nat. Tobacco*, 232 F. Supp. 3d at 171 (stating that there is a common and undivided interest if "individual members of the class could not as a matter of law bring suit other than in a representative capacity" or if no plaintiff could enforce its own interest in the others' absence) (citations omitted).

[6] The defendants cite only one case from this District for the proposition that equitable relief in the form of a single injunction that benefits all plaintiffs constitutes a "common and undivided interest" for aggregation purposes—and ironically, that case strongly favors IRAdvocates' position. In *Kopff v. World Research Group, LLC*, a married couple sued a group of defendants for sending dozens of unsolicited advertisements to the plaintiffs' shared fax machine in violation of the Telephone Consumer Protection Act ("TCPA"). 298 F. Supp. 2d 50, 52 (D.D.C. 2003). The court held that the plaintiffs' right to sue under the TCPA was a collective right, for which amount-in-controversy aggregation would be proper, because the plaintiffs had "a common interest that stem[med] from the transmissions to the single fax machine, *rather than from their individual receipt of unsolicited advertisements*." *Id.* at 56 (emphasis added). The implication is that if the *Kopff* plaintiffs' claims *had* arisen from their *individual* receipt of unwanted adverts, their claims would not be aggregable. The instant case, like other DCCPPA representative suits, is more analogous to the implied counterfactual in *Kopff* than it is to *Kopff* itself: Each individual consumer represented by IRAdvocates *could* sue in his or her own capacity to enforce his or her individual rights under the DCCPPA, much as

The defendants' form-over-substance argument—that this District's application of the non-aggregation principle arbitrarily renders cases non-removable based on the plaintiff's whim to sue in a representative capacity rather than on his or her own behalf alone—fares no better. D.C.'s legislature made the conscious decision to include a private attorney general provision in the DCCPPA. A plaintiff's choice to invoke that provision, and thus bring about its attendant jurisdictional consequences, is not some random accident of fate or act of nature; it is the exercise of a right conferred by representative democratic processes, of the sort that courts must ordinarily respect. Moreover, bringing a representative action on behalf of the general public is not simply a matter of reciting certain magic words in a complaint: a public interest organization such as IRAdvocates must show that it has a "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests," and risks dismissal if that requirement is not met. D.C. Code § 28-3905(k)(1)(D)(ii). And even if a given public interest organization *is* statutorily eligible to bring a suit on behalf of the general public, doing so is still not a costless proposition. That organization is required to notify the Office of the Attorney General of D.C. of its suit within 10 days of filing, and if the D.C. Attorney General elects to initiate a civil action of its own based on the same subject matter, the plaintiff's suit is stayed until the D.C. Attorney General's action is resolved. *Id.* § 28-3905(k)(7). To say that applying the non-aggregation principle to DCCPPA representative actions "elevate[s] form over substance" is to ignore that the plaintiff's choice of "form" has real, substantive implications.

---

if he or she were in "individual receipt of unsolicited advertisements." *Id.*; *see Clean Label Project Found.*, 2021 WL 2809106, at *4. Thus *Kopff* undermines the very proposition for which the defendants cite it. Though the defendants gesture to cases from other districts for support, the Court is more persuaded by the approach its colleagues in this District have taken to date.

**B.  The Non-Aggregation Principle Applies Even If the Cost to the Defendants Does Not Vary with the Number of Beneficiaries**

The defendants next argue that if a plaintiff seeks a single "systematic change," the cost of which would not vary with the number of beneficiaries—who may or may not even be parties to the action—then the amount in controversy should be judged according to the defendants' total compliance costs, rather than a *pro rata* distribution of those costs among the population of party- and nonparty-beneficiaries.  Resp. to Mot. To Remand at 29.  As discussed, myriad cases from this District have adopted the *pro rata* approach, assigning no importance either to the party/non-party distinction or to the inelastic costs of an injunction.[7]  Nevertheless, the defendants argue that this approach conflicts with binding D.C. Circuit precedent, relying on two opinions in particular.

In *Tatum v. Laird*, military servicemembers brought a representative suit to enjoin an allegedly unlawful civilian surveillance program.  444 F.2d 947, 948 (D.C. Cir. 1971).  The court first noted that "where purely injunctive relief is sought, the amount in controversy may be measured by either 'the value of the right sought to be gained by the plaintiff . . . [or the] cost [of enforcing that right] to the defendant . . . ."  *Id.* at 951 (quoting *Hedberg v. State Farm Mut. Auto Ins. Co.*, 350 F.2d 924, 928 (8th Cir. 1965) (Blackmun, J.)).  It went on to hold that the exercise of diversity jurisdiction was proper because the cost to the military of decommissioning the program and destroying all illicitly gathered civilian data "might well exceed" the amount-in-controversy threshold.  *Id.*  And in *Committee for GI Rights v. Callaway*, servicemembers and a non-profit organization brought a putative class action to enjoin certain aspects of the military's drug abuse prevention program.  518 F.2d 466, 468–70 (D.C. Cir. 1975).  The court reiterated the standard

---

[7] In addition to the citations to DCCPPA cases in the preceding section, which have uniformly adopted this methodology, see also *Santa Fe Nat. Tobacco*, 232 F. Supp. 3d at 170–71 (stating that the non-aggregation principle articulated in *Snyder* "extends equally to actions brought by nonprofit groups where the beneficiaries need not be added as parties to the lawsuit").

from *Tatum*: "[T]he amount in controversy may be measured either by the 'value of the right sought to be gained by the plaintiff or the cost of enforcing that right to the defendant.'" *Id.* at 472 (quoting *Tatum*, 444 F.2d at 951). It ultimately concluded that the amount-in-controversy requirement was met, whether measured by the value of the relief inuring to each individual plaintiff, or by the costs that the Army would incur from compliance with a hypothetical injunction. *Id.* at 473.

But in a later opinion, the D.C. Circuit recognized a "possible conflict" between the rule of *Tatum* and *Callaway* on the one hand and the *Snyder* non-aggregation principle on the other. *See Fenster v. Schneider*, 636 F.2d 765, 767 & n.1 (D.C. Cir. 1980). The D.C. Circuit declined to resolve this conflict because it possessed subject-matter jurisdiction under a different statute. *Id.* at 767. The Circuit's decision not to address this tension opened the door for the district courts to reconcile these competing principles as applied to DCCPPA representative actions. And they have almost uniformly held that, although the cost to the defendant may be counted toward the amount in controversy (as in *Tatum* and *Callaway*), that cost must be divided among the beneficiaries to fully honor and effectuate the non-aggregation principle decreed by the Supreme Court.[8]

For example, in *Breakman v. AOL LLC*,[9] the court first declined to consider the cost to the defendant, but held in the alternative that "when a court looks to the compliance costs of a defendant to determine the amount in controversy in an action where separate and [distinct] claims

---

[8] Because this Court is of the opinion that this District's approach to non-aggregation in the DCCPPA context is consonant with binding D.C. Circuit and Supreme Court authority, it is unpersuaded by the defendants' invocation of out-of-Circuit cases which, they claim, counsel a different result. *See* Resp. to Mot. for Remand at 23.

[9] The defendants urge the Court not to follow *Breakman* because that opinion relies in part on "authorities arising out of the class-action context." Resp. to Mot. for Remand at 26. Of course, the fact that *Breakman* analogized—persuasively and logically—to principles that emerge from the class-action context is no good reason, standing alone, to disregard it. The defendants argue that the class-action precedent cited in *Breakman* is inapplicable solely because those class actions sought "individualized benefits for a class of persons" whereas IRAdvocates' DCCPPA suit, in their view, "pursues a single, indivisible remedy . . . ." *Id.* In other words, the distinction that the defendants attempt to draw hinges on the same "common and undivided interest" argument that this Court has already rejected above.

are presented on behalf of multiple parties, 'the cost running to each plaintiff must meet the amount in controversy requirement.'"  545 F. Supp. 2d 96, 106 (D.D.C. 2008) (quoting *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 898 (10th Cir. 2006).  In *Witte v. General Nutrition Corp.*, the court adopted *Breakman*'s alternative approach, holding that consideration of the defendant's "total compliance costs in calculating the amount in controversy . . . would circumvent the non-aggregation principle articulated in *Snyder* and *Zahn*."  104 F. Supp. 3d 1, 6 (D.D.C. 2015) (citing *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 294 (1973)).  In *Organic Consumers Association v. Handsome Brook Farm Group 2, LLC*, the court acknowledged that *Tatum* and *Callaway* permit consideration of either the value of a plaintiff's requested relief or a defendant's costs of compliance, but followed *Breakman* and *Witte* in prorating the total cost of compliance among the beneficiary population.  222 F. Supp. 3d 74, 77–78 (D.D.C. 2016).  As already discussed, every court in this District to consider this issue has followed suit—and when the D.C. Circuit was asked in 2021 to weigh in, it declined to do so.  *See Earth Island Inst.*, 583 F. Supp. 3d at 109–111 (collecting cases and citing *In re Exxon Mobil Corp.*, No. 21-8001 (D.C. Cir. Apr. 23, 2021)).  Particularly in light of the admonition that federal courts are to "construe [their] diversity jurisdiction narrowly," the Court is not moved to upset this consensus.  *Nat'l Org. for Women v. Mut. of Omaha Ins. Co.*, 612 F. Supp. 100, 105 (D.D.C. 1985) (citing *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76–77 (1941)).[10]

---

[10] IRAdvocates offers an additional argument pertaining to the amount-in-controversy debate: regardless of how the cost of compliance is to be distributed, the defendants have not plausibly argued that their cost of compliance should exceed $75,000 *at all*.  The plaintiff argues that the injunctive relief that it requests would be mandatory only within the boundaries of the District of Columbia, which would reduce the defendants' compliance costs as compared to a nationwide injunction, and that the defendants "are not entitled to conjure the most expensive manner to comply with the limited injunctive relief sought," i.e. by marshaling costly legal, design, marketing, and technical resources to revise their public representations.  Reply for Remand at 5.

Even setting aside the defendants' affidavits regarding the hypothetical costs of compliance, these arguments fall wide of the mark.  The defendants are multinational organizations that sell their products all over the United States, among other places, and whose online resources are available for viewing in each and every state.  IRAdvocates allege that

### C. The Hypothetical Attorneys' Fee Award Does Not Satisfy the Jurisdictional Amount-in-Controversy Requirement

The defendants next argue that the attorneys' fees at stake in this dispute satisfy the amount-in-controversy requirement. Their logic proceeds as follows: first, attorneys' fees can be counted toward the amount in controversy when they are provided by statute; second, it makes no sense to divide attorneys' fees *pro rata* when there is a unity of identity between the plaintiff and plaintiff's counsel; and third, IRAdvocates will individually accrue more than $75,000 in attorneys' fees and expenses in the course of this litigation. Therefore, because the DCCPPA provides for recovery of attorneys' fees and IRAdvocates is represented by one of its own attorneys, the fees at issue in this dispute independently satisfy the amount-in-controversy requirement. Though the defendants are correct about the first of their three arguments, and perhaps the second, their syllogism ultimately fails because the Court is unpersuaded by the third.

"When a contract or statute provides that attorney[s'] fees may be included in a judgment against a defendant, the estimated value of these fees may be considered in determining the amount in controversy." *Rasay v. Pepperidge Farm, Inc.*, No. 22-cv-449-BAH, 2022 WL 4300061, at *6 (D.D.C. Sept. 19, 2022) (citing *Mo. State Life Ins. Co. v. Jones*, 290 U.S. 199, 202 (1993)). The DCCPPA is such a statute. *See* D.C. Code § 28-3905(k)(2)(B).

There is some divergence of authority in how courts attribute attorneys' fees to the amount-in-controversy in DCCPPA representative actions. Some courts, including this Court, have held

---

the defendants have violated the DCCPPA through messaging on their websites, in press releases, on social media, and on their product labels. *See generally* Am. Compl. ¶¶ 41–81. It defies common sense to imagine that, if a court were to order injunctive relief against the defendants, they would create special versions of their product labels and digital assets for exclusive and preclusive consumption in the District of Columbia. And even if they could do so, it would *still* be plausible—if not virtually certain—that it would require significant legal, marketing, public relations, manufacturing, and web design resources to assure compliance with an injunction. Moreover, defendants seeking removal to federal court on diversity grounds need not establish to a legal certainty that the requisite amount in controversy is met. *Dart Cherokee Basin*, 574 U.S. at 84.

that when a plaintiff brings a representative suit but seeks no independent damages for itself, its share of the attorneys' fees is considered to be $0 for jurisdictional purposes. *See, e.g.*, *Bimbo Bakeries*, 46 F. Supp. 3d at 73; *see also Handsome Brook*, 222 F. Supp. 3d at 79. Others, however, have applied the same *pro rata* approach to the attorneys' fee award as they would to the cost of compliance with an injunction: the plaintiff's share of attorneys' fees for jurisdictional purposes is the sum total of the hypothetical fee, divided by the represented population. *See, e.g.*, *Clean Label Project Found.*, 2021 WL 2809106, at *7; *Animal Legal Def. Fund*, 249 F. Supp. 3d at 62. It is clear and uncontested that, under either the "$0 theory" or the *pro rata* theory, the attorneys' fees attributable to IRAdvocates in this case would not reach the $75,000 threshold required for diversity jurisdiction: the latter theory would require the fees to exceed the product of $75,000 multiplied by the population of D.C., which is inconceivable.[11]

But the defendants contend that *neither* theory is applicable here, because the plaintiff and plaintiff's counsel are the same entity: IRAdvocates' executive director, Terrence Collingsworth, is serving as co-counsel, so his organization would presumably receive and retain his share of any hypothetical attorneys' fee award. In the defendants' view, engaging in an imaginary *pro rata* distribution of attorneys' fees, or supposing that the plaintiff's share is $0, when in reality the plaintiff organization *itself* would pocket the fee award, would "stretch the [non-aggregation] principle past the breaking point." Resp. to Mot. for Remand at 27.

Ordinarily, DCCPPA representative-suit plaintiffs are represented by outside counsel. The Court is aware of only a few representative actions in which a public interest organization is

---

[11] Because the attorneys' fees for jurisdictional purposes would not exceed $75,000 under either theory, the Court sees no reason to revisit its prior endorsement of the "$0 theory," notwithstanding the defendants' allusion to two opinions that supposedly cut against it. *See* Resp. to Mot. for Remand 14 (citing cases from the Eastern District of Texas and the Southern District of California). The Court does find it curious, however, that the defendants characterize these out-of-District opinions, neither of which interpreted the DCCPPA, as "well-settled precedent." *Id.*

represented by one of its own attorneys—and thus effectively seeks attorneys' fees for itself—none of which substantially reckons with the question of whether a plaintiff's personal share of an attorneys' fee award must be divided by the beneficiary population for purposes of calculating the jurisdictional amount. *See, e.g.*, *Food & Water Watch, Inc. v. Tyson Foods, Inc.*, No. 19-cv-2811-APM, 2020 WL 1065553 (D.D.C. Mar. 5, 2020); *Food & Water Watch v. Smithfield Foods, Inc.*, No. 21-cv-2065-CRC, 2021 WL 8821537 (D.D.C. Dec. 6, 2021). IRAdvocates' reply brief points to no on-point authority and fails to address the question head-on. *See* Reply for Remand 9–11.

IRAdvocates' unusual posture of self-representation strikes the Court as potentially salient to the jurisdictional amount calculation. The justification for engaging in a *pro rata* calculation of attorneys' fees or considering them to be $0 in a DCCPPA representative action is that the plaintiff is typically suing as an ordinary member of the public, with an indistinct interest in the outcome. True, the plaintiff may reap the proceeds of the suit like everybody else, but it has no differentiated personal stake in the action. The court can fairly treat the usual DCCPPA plaintiff's share of attorneys' fees as negligible because, like the general public, it does not personally profit from the fee award. In this dispute, however, because an IRAdvocate attorney is working on the case, the organization stands to gain a differentiated monetary benefit that is not shared with the general public it purports to represent. Disaggregating the fees or imagining them to be $0 in such a case raises the possibility that a self-interested, profit-driven plaintiff could manipulate the D.C. Code and the non-aggregation principle to keep potentially lucrative lawsuits out of federal court, a forum to which the defendant may be rightfully entitled under federal law.

However, the Court need not put a stake in the ground on this issue because, as this Court has held before, "speculation or conclusory statements as to the amount of attorneys' fees is insufficient to establish a jurisdictional amount." *Bimbo Bakeries*, 46 F. Supp. 3d at 74. Because

courts in this District are "'not entirely comfortable with' retaining an action in federal court 'where satisfaction of the amount in controversy requirement depends upon a lump sum award of attorneys' fees," *Smithfield Foods*, 2021 WL 8821537, at *3 (quoting *Hackman v. One Brands, LLC*, No. 18-cv-2101-CKK, 2019 WL 1440202, at *8 (D.D.C. Apr. 1, 2019)), they require some meaningful and reasonably specific allegations as to why attorneys' fees are more likely than not to exceed the jurisdictional amount-in-controversy requirement. *Compare Zuckman v. Monster Beverage Corp.*, 958 F. Supp. 2d 293, 301 (D.D.C. 2013) (holding that the defendant's fee estimate was sufficiently concrete because the plaintiffs, by order of the court, had submitted an affidavit attesting to their hourly billable rates and predicting the number of hours they would likely spend on the litigation), *with Animal Legal Def. Fund*, 249 F. Supp. 3d at 63 (rejecting as speculative a defendant's fee prediction based on its own estimate of opposing counsel's hourly rates and its conclusory assertion that the plaintiff "will assuredly spend" a certain number of hours on the case), *and Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 140 (D.D.C. 2010) (rejecting the defendant's assertions that attorneys' fees would probably exceed the jurisdictional threshold based on a "conservative estimate of $250 per hour of attorney time").

Though the defendants have adduced some concrete information about Collingsworth's co-counsel Kim Richman's hourly billing rates, and gestured to some large fee awards ultimately granted in a handful of other DCCPPA representative actions, they have provided no information whatsoever about Collingsworth's compensation, nor about the division of labor between him and Richman. Instead, Defendants baldly assert that "there can be no doubt that Mr. Collingsworth's request for fees and costs will exceed $75,000" because he "drafted the original complaint, . . . conducted a pre-complaint investigation . . . and presumably will continue to be [] involved in the ongoing proceedings in this case . . . ." Resp. to Mot. for Remand at 26 n.6. The defendants'

assertion about Mr. Collingsworth's future involvement in the case is entirely conjectural. And even if it is true that Mr. Collingsworth led the initial factual investigation and drafted the original Complaint, the defendants offer no hint at all as to how much he would be compensated for those efforts. In sum, even if the defendants are right about aggregating attorneys' fees in representative DCCPPA actions where the plaintiff and plaintiff's counsel are one and the same, their statements about Mr. Collingsworth's fees are too conclusory to justify the exercise of diversity jurisdiction.

### D. Applying the Non-Aggregation Principle to DCCPPA Claims Does Not Frustrate the Non-Aggregation Principle's Underlying Rationale

Finally, the defendants raise what may be fairly characterized as a policy argument. They state, accurately, that the animating purpose of the Supreme Court's non-aggregation doctrine is to prevent multiple plaintiffs from banding together to sneak their trivial, low-dollar-value claims into federal court, in contravention of the amount-in-controversy floor set by Congress. But they argue that the way courts in this District have applied that doctrine to representative DCCPPA action achieves a very different outcome: it prevents even extremely expensive cases from being removed to federal court. The defendants estimate that an injunction would have to exceed $50 billion in total compliance costs in order to satisfy the $75,000 per capita amount-in-controversy requirement that this District's DCCPPA precedent currently demands.

Be that as it may, there are important policy considerations favoring this District's consensus approach as well. It may be practically impossible, as the defendants argue, for a DCCPPA representative suit to meet the extremely high cost threshold for removal under the prevailing *pro rata* approach. But conversely, if the courts were to adopt the defendants' favored approach—that is, measuring amount-in-controversy by the undivided sum of attorneys' fees and the defendants' cost of complying with an injunction—then it would be exceptionally rare for a

case to fall *below* the \$75,000 removal threshold.[12]   That is especially true in cases such as this, where the defendants are large multinational consumer products corporations.  In effect, the choice is between the existing rule, under which virtually *no* representative DCCPPA suit is removable to federal court on diversity grounds, or the defendants' preferred rule, which would render virtually *every* such case removable so long as the parties are completely diverse in citizenship.  The defendants' proposed rule would substantially deprive the D.C. courts of the opportunity to interpret and administer the District's own laws, an outcome that is inconsonant with our federated constitutional design.  *See Williams v. Homeland Ins. Co. of N.Y.*, 18 F.4th 806, 816 (5th Cir. 2021) ("[R]especting state court resolution of state law issues is a bedrock principle of our federal system.") (citing *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 818 (1989)); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) ("While federal courts may be obliged to speak on questions of state law in certain circumstances, we should always be mindful that, absent a strong justification, state law claims belong in state courts.  After all, 'the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'") (O'Scannlain, J., dissenting) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)).

At its core, the defendants' policy argument rests on the improper view that DCCPPA claims that threaten expensive injunctive relief belong in federal court simply because they are so big and important.  They are therefore reminded that "our federal system trusts state courts to hear

---

[12] Indeed, as the defendants themselves are quick to point out, the attorneys' fees in DCCPPA representative actions often exceed \$75,000 *by themselves*, even before accounting for statutory damages or the costs of complying with an injunction.  *See* Resp. to Mot. for Remand at 15 (noting that "If IR[Advocates] is successful, the fee award almost certainly would exceed \$75,000—and by itself satisfy the amount-in-controversy requirement," and collecting illustrative cases with fee awards in excess of \$75,000).  This fact would virtually guarantee removability in the absence of the non-aggregation principle.

most cases—even big, important ones . . . ." *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 705 (3d Cir. 2022) ("[F]ederal courts cannot hear cases just because they are important.") (Bibas, J.).[13]

Other courts in the DCCPPA context have heeded the "longstanding directive that federal jurisdiction should be strictly interpreted." *Clean Label Project Found.*, 2021 WL 2809106, at *4 (quoting *Tyson Foods*, 2020 WL 1065553, at *4). This Court will do the same, and therefore adheres to the consensus approach of dividing compliance costs among the beneficiary population in DCCPPA representative actions.

In sum, the defendants have not convinced the Court to depart from this District's conventional wisdom regarding the calculation of the amount in controversy in representative DCCPPA actions: the cost of complying with a hypothetical injunction must be divided among the beneficiary population, which in this case is the population of D.C. Only if this prorated cost of compliance exceeds $75,000 may the case be removed to federal court pursuant to the diversity jurisdiction statute. And though the defendants have raised a compelling argument regarding the attribution of attorneys' fees in cases where the plaintiff serves as counsel for itself, their allegations that the share of the attorneys' fees that would accrue to IRAdvocates will exceed $75,000 are too speculative to stand on their own. Therefore, the jurisdictional amount required for the Court to exercise diversity jurisdiction is not met and, absent any other basis for subject-matter jurisdiction, the case must be remanded to D.C. Superior Court.

---

[13] This paragraph has referred multiple times to the distinction between federal and state courts. The District of Columbia, of course, is not a state. But "[t]he D.C. Superior Court is considered a state court for removal purposes," *see Flavell v. Int'l Bank for Reconstruction & Dev.*, No. 20-cv-623-CKK, 2022 WL 670213, at *3 n.3 (D.D.C. Mar. 7, 2022) (citing 28 U.S.C. § 1451(a)), and the principles of federalism and local self-governance apply all the same.

IV.    **THE PLAINTIFFS ARE NOT ENTITLED TO ATTORNEYS' FEES OR EXPENSES ASSOCIATED WITH LITIGATING THIS REMAND**

IRAdvocates asks the Court to award it fees and expenses associated with briefing its Motion to Remand because the defendants lacked any "objectively reasonable basis for removal." Mot. for Attorney Fees and Costs 1.  IRAdvocates adds that it "repeatedly informed Defendants of the uniform precedent holding that diversity jurisdiction is lacking," *id.*, precedent that it describes as "binding."  *See* Mot. for Remand at 8.  This request must be denied.

Courts may award fees incurred as a result of wrongful removal under 18 U.S.C. § 1447(c), but "only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005).  Courts in this District confronted with a substantially similar request—submitted, more often than not, by the same attorney serving as IRAdvocates' outside counsel in this dispute—have overwhelmingly denied it.  *See JUUL Labs*, 2023 WL 4531767, at *5 (collecting cases, each of which features Kim Richman as counsel for the plaintiff(s), in which this request is denied).  On each occasion, the reason for denial has been the same: there is no "clear, controlling case law from the D.C. Circuit" on non-aggregation in the DCCPPA context, *id.* (quoting *Breakman*, 545 F. Supp. 2d at 108), so arguing that a court should reject the District's consensus approach is not "objectively unreasonable," even if it runs counter to the overwhelming weight of precedent.[14]  In this dispute, the case for awarding fees associated with the remand litigation is even weaker than usual, because the defendants raised a serious question about the jurisdictional implications of the plaintiff serving as its own counsel in a DCCPPA representative action—a question for which the District's case law furnishes no clear answer, and which the Court has declined to resolve.  Therefore, this Court will follow its own

---

[14] After all, and contrary to IRAdvocates' description of the District's case law as "binding," "the decisions of sister district courts, of course, are not binding on this court."  *Petit v. U.S. Dep't of Educ.*, 578 F. Supp. 2d 145, 155 (D.D.C. 2008) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430 n.10 (1996)).

example, *see Bimbo Bakeries*, 46 F. Supp. 3d at 77, and that of its colleagues, by denying the

Motion for fees associated with the remand litigation.

## V.    CONCLUSION

Based on the foregoing, the Court will **GRANT** IRAdvocates' Motion for Remand, and

**DENY** its Motion for Attorneys' Fees and Costs.  A separate Order shall issue consistent with this

Opinion.


Date: March ___13___, 2025

Royce C. Lamberth
United States District Judge